ANDERSON, Circuit Judge,
dissenting:
The majority today concludes that Timothy Bourgeois was not a “qualified individual with a disability” under the Americans with Disabilities Act (“ADA” or “the Act”), solely because Bourgeois was a former employee. I respectfully disagree with the majority’s conclusion that the ADA provides protection only for currently active employees.
At the outset, it is important to clarify the conduct of the defendant-appellee, Garner Fast Foods, Inc. (“GFF”). The majority correctly notes that GFF discharged Bourgeois in April of 1991 “to avoid paying future health insurance claims” for him. At 1524. The majority fails to mention that GFF took this action, which would clearly be unlawful now that the ADA is in effect, during the two year phase-in that Congress included in the Act, which ran from July 26, 1990, until the July 26,1992, effective date. The purpose of this phase-in period was to give employers time to take those actions necessary to come into compliance with the requirements of the Act. Instead of taking action to come into compliance with the ADA, GFF fired Bourgeois and then, because of Bourgeois’ continued participation in the company health insurance benefit plan, GFF amended that plan to impose an AIDS cap, all shortly before the July 26,1992, effective date of the ADA.
Bourgeois seeks to recover reimbursement only for medical expenses incurred from and after the July 26, 1992, effective date of the Act; he does not seek to retroactively recover expenses incurred before that date. In a case in an almost identical posture, this Court held that the continuation of an allegedly discriminatory health insurance policy constitutes a continuing violation, an “ongoing policy actively maintained by” the employer such that “each week in which divorced men are denied insurance coverage ... constitutes a wrong.” Beavers v. American Cast Iron Pipe Co., 975 F.2d 792, 798 (11th Cir.1992); see also Bazemore v. Friday, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986).[1]
The majority acknowledges that AIDS is a disability under the ADA. They also recognize that fringe benefits like employer-provided health benefits are among the “terms, conditions, and privileges of employment” protected by the Act. At 1525-26 & nn. 6-7. Thus, employer-provided fringe benefits are subject to the anti-discrimination provisions of the ADA. This far, I agree with the majority. However, the majority then concludes that Bourgeois lost all protection under the ADA when he was fired, thereby assuming the status of a former employee. The crux of the majority’s position is that the statutory term “employee” includes only currently active employees, and that the statutory term “qualified individual with a disability” does not include a retired employee or other former employee because such persons can no longer perform the essential functions of the positions which they formerly held. For the reasons that follow, I dissent.
Unlike the majority, I cannot conclude that the plain meaning of the language of the statute limits the Act’s protection to currently active employees or job applicants, and excludes retirees and other former employees. Quite the contrary, the governing language of the general statutory provision uses the broader term “individual”:
*1532 No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.
42 U.S.C. § 12112(a).[2] Moreover, even if the governing general provision had used the term “employee,” rather than the term “individual,” nothing in the plain meaning of that term limits its scope to current employees as opposed to former employees; this is borne out by the case law discussed below.
Finding no conclusive answer in the plain meaning of the statutory language, I turn for guidance to the structure and evident purpose of the statute, the legislative history, the case law, and the guidance provided by the administrative agency charged with enforcing the statute. The purpose of the statute is expressly stated in the broadest possible terms:
It is the purpose of this chapter ... to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.
42 U.S.C. § 12101(b)(1). In addition to its broad purpose, the statute is clearly a remedial one. The law is well established that remedial statutes are to be construed liberally so as to promote the remedial purposes of the statute. Pullman-Standard v. Swint, 456 U.S. 273, 275, 102 S.Ct. 1781, 1783, 72 L.Ed.2d 66 (1982) (Title VII); Corning Glass Works v. Brennan, 417 U.S. 188, 208, 94 S.Ct. 2223, 2234-35, 41 L.Ed.2d 1 (1974) (Equal Pay Act); Terrell v. U.S. Pipe & Foundry Co., 644 F.2d 1112, 1123 (5th Cir. Unit B 1981) (Civil Rights Act of 1964), rev’d on other grounds sub nom. Int’l Assoc. of Machinists and Aerospace Workers, AFL-CIO v. Terrell, 456 U.S. 955, 102 S.Ct. 2028, 72 L.Ed.2d 479 (1982).
Keeping in mind this mandate to liberally construe remedial statutes, I turn to one aspect of the structure of the Act. The majority acknowledges that the protection of the Act extends to fringe benefits provided by employers, such as pension and profit-sharing plans and health benefit plans.[3] It is a matter of common knowledge that fringe benefit plans routinely and commonly cover retirees and other former employees. Indeed, pension and profit-sharing plans are designed primarily for the post-employment years. It is entirely reasonable to infer that Congress intended the Act’s protection to extend to those individuals routinely and commonly included within such fringe benefit plans. It would be counter-intuitive, and quite surprising, to suppose (as the majority nevertheless does) that Congress intended to protect current employees’ fringe benefits, but intended to then abruptly terminate that protection upon retirement or termination, at precisely the time that those benefits are designed to materialize. The structure of the statute, in clearly extending protection to fringe benefit plans, indicates that Congress intended protection for those routinely and commonly covered by such employer-provided plans.
The structure of the Act, its legislative history and the interpretive regulations also establish that Congress intended for the ADA to be construed in a manner similar to Title VII. The text of the ADA expressly incorporates the “powers, remedies and procedures set forth in Title VII.” 42 U.S.C. § 12117(a). Also, much of the language in the ADA mirrors language found in Ttle VII. For example, both define the term *1533 “employee” to mean “an individual employed by an employer.” The House of Representatives Education and Labor Committee wrote:
Several of the definitions set out in title VII of the Civil Rights Act of 1964 are adopted or are incorporated by reference in this legislation — i.e., ... employer, person ... the term “employee” means an individual employed by an employer.
H.R.Rep. No. 485(11), 101st Cong., 2d Sess. 54, reprinted, in 1990 U.S.C.C.A.N. 336.
The provisions in title I of this bill use or incorporate by reference many of the definitions in title VII of the Civil Rights Act of 1964 (employee, employer ...).
Id. at 149, reprinted in 1990 U.S.C.C.A.N. 432.
[TJitle I of this legislation incorporates by reference the definition of the term “employer” and “employee” used in title VII of the Civil Rights Act of 1964_
Id. at 76, reprinted in 1990 U.S.C.C.A.N. 359; see also McDermott International, Inc. v. Wilander, 498 U.S. 337, 342, 111. S.Ct. 807, 811, 112 L.Ed.2d 866 (1991) (“In the absence of a contrary indication, we assume that when a statute uses [a term of art], Congress intended it to have its established meaning.”).
The EEOC interpretive guidelines also support this view. They state that, “[i]n general, the term ‘employee’ has the same meaning that it is given under Title VIL” 29 CFR § 1630.2(a)-(f).[4] Those guidelines note that there are several definitions in Title I of the ADA that are identical, or almost identical, to ones found in Title VII, and that, “[t]hese terms are to be given the same meaning under the ADA that they are given under Title VII.” Id.
Based on the similarities between the texts and remedial purposes of the ADA and Title VII, as well as the evidence of congressional intent, courts interpreting the ADA look to Title VII. See e.g. Carparts Distri. Ctr. v. Automotive Wholesaler’s Assoc., 37 F.3d 12, 16 (1st Cir.1994) (“In making our determination we look for guidance to the Civil Rights Act of 1964 ... and cases interpreting that statute.”); West v. Russell Corp., 868 F.Supp. 313, 317 (M.D.Ala.1994) (holding that the court "will analyze claims of discrimination under the ADA as it would claims under Title VII). This Court should follow this commonsense approach and do so as well.
This Court has construed the term “employee” in the Title VII context to effectuate Congress’ purposes in enacting that legislation. In Bailey v. USX Corp., 850 F.2d 1506 (11th Cir.1988), we held that a former employee had the right to sue his former employer for retaliation under Title VII, despite the language of the statute which referred only to “employees” and “applicants for employment.” Id. at 1509. We noted that “every other court” had thus held, based upon “a common sense reading in keeping with the purpose of the statute.” Id.; see also Charlton v. Paramus Bd. of Educ., 25 F.3d 194 (3rd Cir.1994), cert. denied, — U.S. -, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994); E.E.O.C. v. Ohio Edison Co., 7 F.3d 541 (6th Cir.1993); Passer v. American Chemical Society, 935 F.2d 322 (D.C.Cir.1991); E.E.O.C. v. J.M. Huber Corp., 927 F.2d 1322 (5th Cir.1991) (assuming that former employee can sue under Title VII retaliation provision when employer allegedly retaliates by refusing to pay post-employment profit-sharing benefits); Pantchenko v. C.B. Dolge Company, Inc., 581 F.2d 1052 (2nd Cir.1978); Rutherford v. American Bank of Commerce, 565 F.2d 1162 (10th Cir.1977); but see Robinson v. Shell Oil Co., 70 F.3d 325 (4th Cir.1995), cert. granted, — U.S.-, 116 S.Ct. 1541, 134 L.Ed.2d 645 (1996). We also noted in Bailey that the same rationale had been employed in the age discrimination context to extend protection to former employees. Bailey, 850 F.2d at 1509 (citing with approval E.E.O.C. v. Cosmair, Inc., L’Oreal Hair Care Div., 821 F.2d 1085, 1088 (5th Cir.1987) (“The term ‘employee’ ... is interpreted broadly: it includes a former employee as long as the alleged discrimination is related to or arises out of the employment relation *1534 ship.”)). Following this overwhelming case law, we held that “a strict and narrow interpretation of the word ‘employee’ to exclude former employees would undercut the obvious remedial purposes of Title VII.” Bailey, 850 F.2d at 1509.
It is significant that Congress enacted the ADA in 1990. Congress is deemed to legislate against the background of the federal common law. Astoria Fed. S & L Ass’n v. Solimino, 501 U.S. 104, 108, 111 S.Ct. 2166, 2169-70, 115 L.Ed.2d 96 (1991). When Congress enacted the ADA in 1990, it was clearly established Title VII case law that the term “employee” includes former employees. Congress is deemed to be familiar with such case law. In the ADA, Congress used the same definition of “employee” that it used in Title VII. The text of the ADA expressly refers to Title VII, and the legislative history clearly indicates a congressional intention to incorporate the established Title VII meaning for the term “employee.”
The majority purports to “easily distinguish” Bailey and the other retaliation cases. However, the only rationale offered for the distinction, beyond the majority’s ipse dixit that retaliation cases are different, is that a broad interpretation of the term “employee” was “necessary to provide meaning to anti-retaliation provisions and effectuate congressional intent.” At 2977. It is not at all apparent what difference there is between Title VII anti-retaliation claims and claims by former employees for discrimination with respect to fringe benefits. The anti-retaliation provision would have ample scope without claims by former employees. For example, current employees often sue for retaliation when subjected to discrimination because of having filed an EEOC complaint. It is no more necessary with respect to Title VII retaliation than it is here to include former employees in order to “provide meaning” to the statute. Indeed, the denial of claims of former employees with respect to fringe benefits would seem to intrude more severely on the obvious congressional intent to protect employer-provided fringe benefits. As a matter of common experience, fringe benefits are designed and provided primarily for the post-employment years. I respectfully submit that the majority’s attempted distinction of Bailey and the retaliation cases is flawed. Bailey is binding precedent, and its rationale should govern this case.[5]
The text of the statute also expressly refers to the Rehabilitation Act of 1973. 42 U.S.C. § 12201(a) (“[Njothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973.”). The majority acknowledges that Congress intended the courts to interpret the ADA with reference to the Rehabilitation Act. M/S at 15 (citing H.R.Rep. No. 485(11), 101st Cong., 2d Sess. 23 (1990)). Section 504 of the Rehabilitation Act prohibits discrimination against an “otherwise qualified handicapped individual” in any federally funded program. 29 U.S.C. § 794. Analysis of the cases construing this phrase provides insight into logic behind Congress’ use of the nearly identical “qualified individual with a disability.”
The Supreme Court has held that “[a]n otherwise qualified person [under § 504] is one who is able to meet all of a program’s requirements in spite of his handicap.” Southeastern Community College v. Davis, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). The Court captured the essence of this concept when it wrote:
Section 504 by its terms does not compel educational institutions to disregard the disabilities of handicapped individuals or to make substantial modifications in their programs to allow disabled persons to participate. Instead, it requires only that an “otherwise qualified handicapped individual” not be excluded from participation in a federally funded program “solely by reason of his handicap,” indicating only that mere possession of a handicap is not a *1535 permissible ground for assuming an inability to junction in a particular context.
Id. at 405, 99 S.Ct. at 2366 (emphasis added).
The court in Modderno v. King, 871 F.Supp. 40 (D.D.C.1994), aff'd, 82 F.3d 1059 (D.C.Cir.1996), addressed a Rehabilitation Act claim of discrimination in the provision of health insurance fringe benefits. The plaintiff, Modderno, was the former spouse of a Foreign Service officer, and qualified for Foreign Service Benefit Plan health insurance on that basis. During the period that she was covered by the Plan, the Plan imposed a lower limit on mental health benefits,[6] as compared to the limit on benefits for physical ailments. Modderno, 82 F.3d at 1060. Although the court did not find that this limit amounted to discrimination in violation of § 504, it nonetheless implicitly recognized that a plan participant could assert a claim of discrimination in the provision of fringe benefits. The Moddemo district court wrote that,
To establish a prima facie case under § 504, a person must be handicapped under the Act, otherwise qualified to receive or participate in the federally supported benefit or -program, and be excluded from the benefit solely by reason of her or his handicap.
Modderno, 871 F.Supp. at 42 (citing Pesterfield v. Tennessee Valley Authority, 941 F.2d 437, 441 (6th Cir.1991) (emphasis added)).[7]
Finally, my position that retirees and other former employees are protected under the ADA is supported by a common sense reading of the statute. As noted above, § 12111(8) provides that a “qualified individual with a disability” means “an individual with a disability who ... can perform the essential functions of the employment position....” A retired or former employee, like Bourgeois, has already performed all of the functions expected of him with respect to the job he occupied before retirement. Under the company’s plan, the only additional “functions” expected of Bourgeois, and other retired or former employees, are to make the appropriate election, pay the premiums, etc. Fringe benefits, such as the one at issue here, are all part of the overall compensation package provided for employees as consideration for their service during their active years with the company. Post-employment benefits are like deferred compensation, and are expected to be enjoyed during the post-employment years. The common sense of the concept, “qualified individual with a disability,” is that there should be no discrimination because of stereotypes or stigmas. Differences in treatment are legitimate when based on the ability of a person to perform the functions expected in the position. In other words, the protections of the Act accrue to disabled persons who can perform the functions expected to. be performed by persons without disability in the same position. As the Supreme Court put it in Southeastern Community College v. Davis: “Mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context.” 442 U.S. at 405, 99 S.Ct. at 2366 (emphasis added). Applying that common sense in the instant context, it is obvious that retirees and other former employees, who because of their prior employment are entitled to participate in post-employment fringe benefit plans, are not expected to perform the functions of the jobs they previously held before retirement. Rather, they are expected to meet whatever criteria are mandated by the fringe benefit plan for the accrual and continuation of coverage, including, for example, any required minimum years of employment, honorable discharge, and the payment of premiums.
*1536 In summary, I respectfully submit that the majority sees “plain meaning” when there is none. The majority ignores the common sense reading of the statute and the evident congressional purpose as revealed in the structure of the statute, its legislative history, and the overwhelming case law which provided the background against which Congress legislated.[8] Because I cannot agree with the majority’s conclusions, I respectfully dissent.

. The majority' assumes that the violation alleged here is a continuing violation. At 1526. As noted, this result is dictated by binding precedent.

. The majority emphasizes the language of § 12112(b) which sets out a nonexclusive list of actions (or types of action) which constitute discrimination. At 2975. The majority takes comfort in the fact that many of the actions described refer to employees or applicants. Not only is this list expressly nonexclusive, but the focus of the subsection is on the description of actions that constitute discrimination, not on the persons protected by the Act. In any event, not all of the descriptions refer to employees or applicants. See § 12112(b)(4) & (6).

. Section 12112(a) expressly extends protection to “other terms, conditions, and privileges of employment.’’ The statute also makes several other references indicating that fringe benefits are protected. See § 12112(b)(2) & (4). The majority concedes that it is clear that fringe benefits are protected by the ADA, citing the statute, its legislative history, and the interpretive regulations. At 1526 & n. 7.

. EEOC guidelines, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.” Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986).

. Other non-retaliation Title VII cases have also extended protection to former employees. See E.E.O.C. v. South Dakota Wheat Growers Ass’n, 683 F.Supp. 1302 (D.S.D.1988) (rejecting the argument that Tide VII does not cover post-employment health benefits); see also Long v. State of Florida, 805 F.2d 1542 (11th Cir.1986), rev’d on other grounds, 487 U.S. 223, 108 S.Ct. 2354, 101 L.Ed.2d 206 (1988) (assuming that former employees have standing under Title VTI to challenge discriminatory practices with regard to payments from employee pension plan).

. The Plan was changed to include a $75,000 lifetime maximum for mental health benefits.

. The Eighth Circuit, in Beauford v. Father Flanagan's Boys' Home, 831 F.2d 768 (8th Cir.1987), employed a rationale very similar to that of the majority in this case. The opinion makes no reference to the overwhelming Title VII case law discussed above. I respectfully submit that Beauford, like the majority opinion in this case, ignored not only that overwhelming case law, which constitutes the background against which Congress legislated, but also, ignored the obvious common sense construction of the statute in light of its purpose and legislative history. See Price Waterhouse v. Hopkins, 490 U.S. 228, 241, 109 S.Ct. 1775, 1786, 104 L.Ed.2d 268 (1989) ("We need not leave our common sense at the doorstep when we interpret a statute.”).

. I have found very few ADA cases squarely addressing the issue before us. A district court in the Northern District of Illinois rejected as unpersuasive and without case law support an argument that the employment provisions of the ADA do not apply to former employees. Northen v. City of Chicago, 841 F.Supp. 234, 236 (N.D.Ill.1993). However, Parker v. Metropolitan Life Ins. Co., 875 F.Supp. 1321 (W.D.Term.1995), appeal docketed, No. 95-5269 (6th Cir.1995), followed Beauford v. Father Flanagan's Boys’ Home, 831 F.2d 768 (8th Cir.1987), and held that a former employee was not a qualified individual with a disability, and thus could not make an ADA claim under the employer's disability plan. The Parlcer court based this holding on its conclusion that the employee had become totally disabled and was no longer able to perform the essential functions of the job she had previously held. In my judgment, Parker, like Beauford, is flawed. It failed to address the overwhelming Title VII case law which provided the background against which Congress enacted the ADA, and failed to address the common sense construction of the Act in light of its purpose and legislative history.