BLACK, Circuit Judge:
Appellant August Gonzales filed this action under Title I of the Americans With Disabilities Act of 1990 (ADA),[1] alleging that Defendants discriminated against a former employee, Timothy Bourgeois, by imposing a cap for AIDS-related treatment on health insurance benefit coverage Bourgeois elected to continue following his termination. The district court granted a motion to dismiss jointly filed by Gamer Fast Foods, Inc. (GFF) and Garner Food Services, Inc. (GFS). Thereafter, Appellant dismissed claims against all Defendants other than GFF and moved for reconsideration of the order of dismissal. This motion was denied, and Appellant appeals. We affirm.
I. BACKGROUND[2]
Bourgeois was employed at a Hardee’s restaurant, owned and, operated by GFS. GFS sponsored and administered a group welfare benefit plan which provided health insurance coverage up to a $1 million lifetime limit. Bourgeois participated in the health insurance benefit plan through his employment.
Bourgeois was diagnosed with AIDS in February 1991, and GFS learned of his condition when he submitted health insurance claims for medical treatment. GFS discharged him in April 1991 to avoid paying future health insurance claims. Following his termination, Bourgeois paid the necessary premiums to continue his health insurance benefit coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).[3]
At least partly because of Bourgeois’ continued participation in the health insurance benefit plan after his discharge, GFS amended the plan on October 1, 1991, to cap AIDS-related treatment to $10,000 annually with a lifetime maximum limit of $40,000. GFS ceased operations on March 31, 1992. Thereafter, GFF continued GFS’ operations, and became the sponsor of Bourgeois’ plan.[4] *1525 Before he died on September 6, 1992, Bourgeois had exhausted the benefits available to him under the AIDS cap limit and was denied payment for claims submitted in excess, totaling approximately $90,000.
II. STANDARD OF REVIEW
The district court’s denial of Appellant’s motion for reconsideration is reviewed for abuse of discretion. See Region 8 Forest Serv. Timber Purchasers Council v. Alcock, 993 F.2d 800, 806 (11th Cir.1993), cert. denied, 510 U.S. 1040, 114 S.Ct. 683, 126 L.Ed.2d 651 (1994). Since our review requires us to focus on conclusions of law made by the district court in granting the motion to dismiss, we review these questions of law de novo. See O’Reilly v. Ceuleers, 912 F.2d 1383, 1385 (11th Cir.1990).
III. DISCUSSION
The ADA was enacted on July 26, 1990, but did not become effective until July 26, 1992.[5] Pub.L. No. 101-336, § 108, 104 Stat. 327, 337 (1990). Title I of the ADA addresses disability discrimination by employers.[6] As applied to private employers, Title I is not retroactive. See O’Bryant v. City of Midland, 9 F.3d 421, 422 (5th Cir.1993); see also 1990 U.S.C.C.A.N. 601 (statement by President George Bush upon signing S. 933). Against this background, courts have concluded that Title I apples only to wrongful acts committed after the effective date of the ADA. See, e.g., O’Bryant, 9 F.3d at 422. Since the AIDS cap was implemented in October 1991, prior to the effective date of the ADA, GFF argues from the outset that Appellant’s claim is barred.
Appellant counters that his claim is actionable on the basis that the AIDS cap “endured” after the effective date of the ADA, thereby making GFF’s refusal to pay health benefits from then until Bourgeois’ death a continuing violation of the Act. In determining whether maintenance of the AIDS cap after July 26, 1992, constituted a continuing violation of the ADA, this Court must distinguish between the present consequences of a one-time violation, which would not qualify as a continuing violation, and the continuation of the violation into the present, which would. See Beavers v. American Cast Iron Pipe Co., 975 F.2d 792, 796 (11th Cir.1992). As did the district court, we will assume for purposes of our analysis that the denial of AIDS-related health care benefits after the effective date of the ADA could constitute a continuing violation of the Act. See Bazemore v. Friday, 478 U.S. 385, 395, 106 S.Ct. 3000, 3006, 92 L.Ed.2d 315 (1986) (“A pattern or practice that would have constituted a violation of Title VII, but for the fact that the statute had not yet become effective, became a violation upon Title VU’s effective date.”); Beavers, 975 F.2d at 797-98 (holding that the continued maintenance of a pre-Title VII discriminatory benefits policy is actionable after the effective date of Title VII as a continuing violation of the statute).
GFF argues that even if maintaining the AIDS cap beyond the effective date of the ADA could constitute a continuing violation, Appellant fails to state a prima facie ease of discrimination under Title I of the Act. The Title I general rule states: “No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.” 42 U.S.C. § 12112(a) (emphasis supplied). A “qualified individual with a disability” (QID) *1526 is defined as “an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual ■ holds or desires.[7] Id. § 12111(8) (emphasis supplied).
The parties do not dispute that AIDS is a disability recognized under the ADA.[8] It is further undisputed that fringe benefits, such as employer-provided health benefits, are one set of the “terms, conditions, and privileges of employment” protected from unlawful discrimination under the ADA.[9] Thus, Appellant reasons, once Bourgeois took advantage of the opportunity to participate in the group health insurance plan, he was entitled to be provided with health insurance in a nondiscriminatory manner.
Bourgeois does not satisfy the QID requirement under the plain language of the ADA, however, because he neither held nor desired to hold a position with GFF at or subsequent to the time the alleged discriminatory conduct was committed. Rather, Bourgeois was a participant in the health benefit plan only by virtue of his status as a former employee. Appellant does not contest this conclusion, but argues that since the fruits of many fringe benefits are realized during the post-employment period, Congress must have intended former employees to be protected under the ADA as well.
Neither the QID definition nor the ADA’s definitions of “employee” and “discriminate” provide support for Appellant’s position. The ADA defines “employee” as “an individual employed by an employer,”[10] Id. § 12111(4) (emphasis supplied). Further, § 12112(b) provides:
As used in subsection (a) of this section, the term “discriminate” includes—
(1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;
(2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity’s qualified applicant or employee with a disability to the discrimination prohibited by this subchapter ...;
(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee ... or
(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability ...;
(6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and *1527 is consistent with business necessity.[11]
Id. § 12112(b) (emphases supplied).
Moreover, the legislative history of the ADA specifically states that the purpose of including the phrase “essential functions” within the QID definition is to “ensure that employers can continue to require that all applicants and employees, including those with disabilities, are able to perform the essential, i.e., the non-marginal functions of the job in quesiton [sic].” H.R.Rep. No. 485(11), 101st Cong., 2d Sess. 55 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 337 (emphasis supplied). Thus, a review of both the ADA and its legislative history suggests that Congress intended to limit the protection of Title I to either employees performing, or job applicants who apply and can perform, the essential functions of available jobs which their employers maintain.
Appellant argues against such a conclusion on the basis that other legislative history of the ADA, as well as Equal Employment Opportunity Commission (EEOC) interpretive guidance, suggest that courts should construe the ADA by analogy to Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq. (1994). As does the general rule of Title I of the ADA, the general rule of Title VII prohibits discrimination with respect to the “terms, conditions, or privileges of employment.” 42 U.S.C. § 2000e-2(a). Further, the Supreme Court found that health insurance coverage made pursuant to an employment relationship is a term, condition, or privilege of employment as defined under the Title VII general rule. Newport News Shipbuilding and Dry Dock Co. v. EEOC, 462 U.S. 669, 682, 103 S.Ct. 2622, 2630, 77 L.Ed.2d 89 (1983).
With respect to employment-related terms, legislative history of the ADA states that the provisions in Title I use or incorporate by reference several of the definitions in Title VII, including the term “employee.” H.R.Rep. No. 485(11); 101st Cong., 2d Sess. 54, reprinted in 1990 U.S.C.C.A.N. 303, 336. The EEOC has observed that the definitions in Title I “are identical, or almost identical” to those found in Title VII and should be given the same meaning. 56 Fed.Reg. 35726, 35740 (July 26, 1991) (EEOC Interpretive Guidance on 29 C.F.R. § 1630.2(a)-(f)). .The EEOC has further stated that but for a Title VII exception for public officials not found in the ADA, “the term ‘employee’ has the same meaning [under the ADA] that it is given under Title VII.” Id.
Against this background, Appellant points to the Title VII retaliation statute, contending that although the statute on its face only protects “employees” and “applicants for employment” from illegal retaliation, 42 U.S.C. § 2000e-3, courts have broadened the class of protected persons under the statute to include former employees. Indeed, in construing the retaliation statute, this Court reasoned:
While it is true that the language of a statute should be interpreted according to its ordinary, contemporary and common meaning ... this plain-meaning rule should not be applied to produce a result which is actually inconsistent with the policies underlying the statute. In the instant case, a strict and narrow interpretation of the word “employee” to exclude former employees would undercut the obvious remedial purposes of Title VII.
Bailey v. USX Corp., 850 F.2d 1506, 1509 (11th Cir.1988) (citation omitted).
In farther support of his argument, Appellant relies on EEOC v. Cosmair, Inc., L’Oreal Hair Care Div., 821 F.2d 1085 (5th Cir.1987), an anti-retaliation case involving the receipt of post-employment fringe benefits. In Cosmair, the Fifth Circuit expanded the meaning of the term “employee” to include former employees so long as the disability-based discrimination is related to or arises out of the employment relationship. , 821 F.2d at 1088. The statute at issue in Cos-mair was the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 et seq. (1994); Bailey was a Title VII ease. Since this Court in Bailey cited Cosmair, see Bailey, 850 F.2d at 1509, however, Appellant *1528 contends that former employees suing in this Circuit for retaliation affecting post-employment fringe benefits have a cause of action under Title VII, and by analogy, Title I of the ADA. Thus, Appellant reasons, because Bourgeois’ participation in the-health benefit plan arose out- of his employment, and the refusal to pay benefits arguably constituted a continuing violation into the effective period of the ADA, he is entitled to recover damages for discrimination suffered by Bourgeois after the effective date of the ADA.
Finally, Appellant cites EEOC v. South Dakota Wheat Growers Ass’n, 683 F.Supp. 1302 (D.S.D.1988), in which the issue considered was whether Title VII governed a health insurance policy “provided after termination of employment, as a consequence of such employment.” 683 F.Supp. at 1304. In deciding that question in the affirmative, the district court found that “discrimination arising out of the employment relationship is unlawful regardless of ‘whether or not the person discriminated against is an employee at the time of [the] discriminatory conduct.’ ” Id. (quoting Pantchenko v. C.B. Dolge Co., Inc., 581 F.2d 1052, 1055 (2d Cir.1978)). The court concluded that it was unlawful for an employer to discriminate against a former employee in the provision of post-employment health insurance coverage. Id. at 1304-05.
Based upon the foregoing, Appellant argues this Court should look to Title VII in seeking to understand ADA employment terms and conclude that former employees are included within the scope of ADA protection. We disagree. The cardinal rule of statutory construction is that the language of a statute should be interpreted in accordance with its ordinary, contemporary, and common meaning. Bailey, 850 F.2d at 1509. Although we may resort to the EEOC’s interpretive guidelines for assistance in our analysis, they are not controlling upon this Court. See Mentor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). Absent clearly expressed legislative intent to the contrary, the plain language of the statute should be conclusive. Consumer Prod. Safety Comm’n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). In adhering to the cardinal rule, we find the plain language of the ADA clearly demonstrates the intent of -Congress to limit the scope of the Act to only job applicants and current employees capable of performing essential functions of available jobs. We find no clearly expressed legislative intent suggesting that former employees such as Bourgeois should be covered under the Act as well.[12]
Appellant cites no binding authority demonstrating that the ADA protects former employees. And, with two exceptions, the only cases cited by Appellant discussing former employees’ rights to sue their former employers involve claims which arose under explicit anti-retaliation provisions contained in Title VII- and the ADEA.[13] These retaliation cases are easily distinguishable.
This Court in Bailey cautioned that courts should avoid a literal interpretation of a statute when such an approach would frustrate *1529 the statute’s central purpose. Bailey, 850 F.2d at 1509. There is no such risk in this case. As this Court in Bailey recognized, the expansion of the term “employee” to confer standing to sue upon former employees claiming retaliation is necessary to provide meaning to anti-retaliation statutory provisions and effectuate congressional intent.[14] Id. There are, however, no allegations of retaliation in this case, and excluding former employees from protection under the Act is not inconsistent with the policies underlying the statute. To the contrary, interpreting the ADA to allow any disabled former employee to sue a former employer essentially renders the QID requirement under the Act, that an individual with a disability hold or desire a position the essential functions of which he or she can perform, meaningless.
In the alternative, Appellant attempts to redefine the QID requirement by reference to § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1994). Appellant correctly notes that decisions interpreting the Rehabilitation Act, the ADA’s statutory predecessor, are relevant precedent in interpreting the provisions of the ADA. H.R.Rep. No. 485(11), 101st Cong., 2d Sess. 23 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 304. Under § 504, no “otherwise qualified handicapped individual” may be discriminated against under any federally funded activity or program. 29 U.S.C. § 794. As the phrase “otherwise qualified handicapped individual” is not defined in the Rehabilitation Act, the Supreme Court attempted to do so in Southeastern Community College v. Davis, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). In Davis, the Supreme Court considered a claim of a licensed practical nurse who was denied admission to a college’s nursing program because of a hearing disability. 442 U.S. at 402, 99 S.Ct. at 2365. In its analysis, the Supreme Court determined that “[a]n otherwise qualified person [under § 504] is one who is able to meet all of a program’s requirements in spite of his handicap.” Id. at 406, 99 S.Ct. at 2367. Finding plaintiff unable to do so, the Supreme Court denied relief. Id. at 414, 99 S.Ct. at 2371.
In an effort to shoehorn Bourgeois into the Supreme Court’s definition of “otherwise qualified person” in Davis, Appellant and the EEOC attempt to analogize the nursing “program’s requirements” in Davis with the “requirements” Bourgeois needed to fulfill to participate in the health benefits “program” following his termination. By analogy to § 504, they contend that for Bourgeois to be considered “qualified” under Title I of the ADA, he need not have been a current employee or job applicant “qualified” to perform essential functions of an available job; instead, citing Davis, they argue he need only have been “qualified” to meet the “requirements” of the health benefits plan.[15]
*1530 While comparing the qualifications necessary for admission to the nursing program in Davis to those required for Bourgeois to receive health benefits is like comparing applies to oranges, Appellant draws support for his argument from Modderno v. King, 871 F.Supp. 40 (D.D.C.1994), aff'd, 82 F.3d 1059 (D.C.Cir.1996). In Modderno, plaintiff brought suit alleging discrimination- on the basis of her disability in violation of § 504. 871 F.Supp. at 41. The district court determined that “[t]o establish a prima facie case under § 504, a person must be handicapped under the Act, otherwise qualified to receive or participate in the federally supported benefit or program, and excluded from the benefit solely by reason of her or his handicap.” Id. at 42 (citing Pestevfield v. Tennessee Valley Auth., 941 F.2d 437, 441 (6th Cir.1991)) (emphasis supplied). Although the district court ultimately granted defendant’s motion to dismiss upon finding that plaintiff was not denied benefits solely by reason of her handicap, id. at 42-43, Appellant argues this Court should nevertheless find Moddemo instructive in giving meaning to the phrase “otherwise qualified handicapped individual” under the Rehabilitation Act.
We decline this invitation. The Moddemo decision is not binding in this Circuit, and we disagree with the court’s holding. What Appellant, the EEOC and the Moddemo court have done is manipulate the Supreme Court’s decision in Davis interpreting the phrase “otherwise qualified handicapped individual” under § 504 to essentially create a new job category: a “post-employment benefits recipient.” The Eighth Circuit appropriately rejected such an argument in Beauford v. Father Flanagan’s Boys’ Home, 831 F.2d 768 (8th Cir.1987), cert. denied, 485 U.S. 938, 108 S.Ct. 1116, 99 L.Ed.2d 277 (1988). In Beauford, plaintiff was unable to perform the essential functions of any available job the employer maintained but claimed she was still protected under § 504 because she was handicapped and eligible for fringe benefits. 831 F.2d at 771-72. In its analysis, the Eighth Circuit considered both the Supreme Court’s decision in Davis, as well as the federal regulations which define a “qualified handicapped person” under the Rehabilitation Act as the following:
(1) With respect to employment, a handicapped person who, with reasonable accommodation, can perform the essential functions of the job in question;
(4) With respect to other services, a handicapped person who meets the essential eligibility requirements for the receipt of such services.
45 C.F.R. § 84.3(k).
The Eighth Circuit ruled out subheading (4), upon which plaintiff relied, determining the provision does not apply to discrimination with respect to employee benefits, but rather to discrimination by health, welfare and social services providers toward applicants attempting to obtain such services. Beauford, 831 F.2d at 771-72. Finding subheading (1) to be the proper category governing plaintiffs claim, the court concluded that “both the language of the statute and its interpretation by the Supreme Court [in Davis ] indicate that section 504 was designed to prohibit discrimination within the ambit of an employment relationship in which the employee is potentially able to do the job in question.” Id. at 771 (emphasis supplied).
We are persuaded by the reasoning of the Eighth Circuit in Beauford, finding it consistent with congressional intent underlying Title I of the ADA. Since Bourgeois was neither a job applicant nor a current employee capable of performing essential functions of an available job with GFF at or subsequent' to the time the alleged discriminatory conduct was committed,[16] he was not a QID *1531 within the meaning of the ADA. Thus, Appellant is not entitled to relief.[17]
IV. CONCLUSION
We conclude that Bourgeois, a former employee, was not a “qualified individual with a disability” as defined under the ADA and therefore not entitled to the Act’s protection. The district court appropriately denied Appellant’s motion for reconsideration of the order of dismissal.
AFFIRMED.

. 42 U.S.C. § 12101 et seq. (1994). Appellant initially sought relief under both § 510 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1140 (1994), and the ADA, but subsequently dismissed the ERISA claim.

. Since the district court decided this case on a motion to dismiss, we have taken the allegations in Appellant’s complaint as true and have construed them liberally in favor of Appellant. See Walker Process Equip., Inc. v. Food Mach. and Chem. Corp., 382 U.S. 172, 174-75, 86 S.Ct. 347, 349, 15 L.Ed.2d 247 (1965).

. 29 U.S.C. § 1161 et seq. (1994). COBRA amended ERISA to require each employer to allow former employees to elect to continue coverage under the employer’s group health insurance plan for up to 18 months following termination of employment. Id.

. At the outset, GFF denies liability on the bases that Bourgeois worked only for GFS and not GFF and never sought employment from GFF. Citing this Court’s decision in Bud Antle, Inc. v. Eastern Foods, Inc., 758 F.2d 1451 (11th Cir.1985), Appellant counters that GFF is liable under theories of de facto merger and mere continuation because GFF took over the operations of *1525 the defunct GFS with identical officers, directors, and virtually an identical sole shareholder, maintained the same health plan and AIDS cap first implemented by GFS, and assumed all liabilities of GFS. We decline to resolve this issue. Given our holding that Appellant is not entitled to relief under the ADA, GFF is not liable even if it is a successor in interest to GFS.

. The dissent refers to the two year span between the enactment and effective dates as a "phase-in period,” the purpose of which was "to give employers time to take those actions necessary to come into compliance with the requirements of the Act”; however, the dissent cites no authority indicating this was Congress’ intent.

. It is undisputed that GFS met the ADA definition of "employer.” See 42 U.S.C. § 12111(5)(A).

. Thus, § 12112(a) does not utilize the term “individual" in a broad manner, as suggested by the dissent, but rather within a specific term of art-— "qualified individual with a disability” — explicitly defined in § 12111(8).

. See. 28 C.F.R. §§ 35.104 (defining "disability” to include HIV disease at (l)(ii)), 36.104 (same at (l)(iii)) (1995).

. This is clear from the statute, see, e.g., 42 U.S.C. §§ 12101(a)(5), 12112(a), (b)(2), (b)(4), the legislative history, see H.R.Rep. No. 485(11), 101st Cong., 2d Sess. 59 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 341 ("[E]mployers may not deny health insurance coverage completely to an individual based on the person's diagnosis or disability.”); H.R.Rep. No. 485(111), 101st Cong., 2d Sess. 71 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 494, and the interpretive regulations, see, e.g., 29 C.F.R. § 1630.4(f) (it is unlawful for an employer to discriminate on the basis of disability in the provision of "[f]ringe benefits available by virtue of employment”); 56 Fed.Reg. 35726, 35746 (July 26, 1991) (EEOC Interpretative Guidance on 29 C.F.R. §§ 1630.4, 1630.5).

.This definition directly rebuts the suggestion of the dissent that "nothing in the plain meaning of [the] term ['employee'] limits its scope to current employees as opposed to former employees."

. Although the dissent maintains § 12112(b)(6) does not specifically “refer to employees or applicants,” the plain language of the provision contemplates discrimination encountered solely by job applicants and current employees.

. Citing no authority, the dissent contends “[i]t would be counter-intuitive, and quite surprising, to suppose (as the majority nevertheless does) that Congress intended to protected current employees’ fringe benefits, but intended to then abruptly terminate that protection upon retirement or termination, at precisely the time that those benefits are designed to materialize.” Since we find no clearly expressed legislative intent of Congress to suggest that former employees should be included within the scope of ADA protection, we respectfully disagree.

. Thus, contrary to the dissent’s broad assertion that "[wjhen Congress enacted the ADA in 1990, it was clearly established [in] Title VII case law that the term 'employee' includes former employees,” the overwhelming majority of Title VII cases which have so found have been in the retaliatory context. The only exceptions cited by Appellant are Wheat Growers, 683 F.Supp. at 1302, a Title VII case not binding upon this Court, and Northen v. City of Chicago, 841 F.Supp. 234 (N.D.Ill.1993). In Northen, former Chicago police officers receiving disability pensions sued the city over its decision to require the retirees to pay for health insurance. 841 F.Supp. at 235. In denying the city's motion to dismiss, the district court held that "[a]t the initial pleading stage it is too early to conclude that retirees are not covered employees under the ADA.” Id. at 236. We are not bound by Northen, and the decision is not persuasive in that the court dismissed the case without ever addressing whether the retirees were in fact QIDs under the ADA.

. Again with no support, the dissent counters: The anti-retaliation provision would have ample scope without claims hy former employees. For example, current employees often sue for retaliation when subjected to discrimination because of having filed an EEOC complaint. It is no more necessary with respect to Title VII retaliation than it is here to include former employees in order to ‘provide meaning’ to the statute.
While we recognize that retaliation claims may be filed by current employees, we disagree with the dissent's conclusion that ‘‘[t]he anti-retaliation provision would have ample scope without claims by former employees." To the contrary, we note that many retaliation claims are filed by former employees alleging, for example, post-employment blacklisting. See, e.g., Bailey, 850 F.2d at 1507 (alleging that former employer gave unfavorable reference to prospective employer in retaliation for former employee’s having filed sex discrimination suit); Pantchenko, 581 F.2d at 1054 (alleging that former employer refused to furnish letters of recommendation in retaliation for former employee's having filed discrimination charges with EEOC); Rutherford v. American Bank of Commerce, 565 F.2d 1162, 1163-64 (10th Cir.1977) (alleging that in retaliation for filing sex discrimination charge against former employer, it advised prospective employer of charge).

. Consistent with this argument, the dissent maintains that a former employee seeking fringe benefits may satisfy the QID definition merely by performing such essential functions as ’’mak[ing] the appropriate election, pay[ing] the premiums, etc.” This position completely ignores the legislative history of the ADA discussed herein, which states that the purpose of including the phrase “essential functions” within the QID definition is to "ensure that employers can continue to require that all applicants and employees, including those with disabilities, are able to perform the essential, i.e., the non-marginal functions of the job in quesiton [sic].” H.R.Rep. No. 485(11), *1530 101st Cong., 2d Sess. 55 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 337 (emphases supplied).

. Arguing that Bourgeois was employed at a competing fast food restaurant until shortly before his death, Appellant urges this Court to remand the case for development of the record as to Bourgeois' ability to perform the “essential functions” of his job. We decline to do so. While Bourgeois may indeed have been able to perform the essential functions of a job, including the job he held while previously employed by GFS, he was neither a current employee of nor a job applicant with GFF at or subsequent to the time the alleged discriminatory conduct was committed. Accordingly, we find Bourgeois was not covered under Title I of the ADA.

. This opinion should not be read to infer that a former employee has no recourse in the event an employer makes a substantial change in a health insurance benefit plan following discharge. There is simply no cause of action under the ADA.